ARKANSAS INSPECTION & RATING BUREAU *v.* INSURANCE COMPANY OF NORTH AMERICA.

4-9442                                        238 S. W. 2d 929

Opinion delivered April 30, 1951.

*Verne McMillen* and *Wright, Harrison, Lindsey & Upton,* for appellant.

*John C. Phillips* and *Blake Downie,* for appellee.

HOLT, J.    This appeal questions an order of the Arkansas Insurance Commissioner, affecting a rating plan filed by the Insurance Company of North America and certain allied companies, all permitted to write and engage in writing fire insurance in Arkansas under Act 50

of 1947 (Ark. Stats., 1947, §§ 66-401 to 66-416, inclusive). The order in question was made August 15, 1950, and permitted appellees in writing fire insurance to use what is known as the Installment Premium Endorsement Plan. On appeal to the Pulaski Circuit Court, the above order was affirmed in part and reversed in part September 26, 1950.

The question presented is of first impression here.

Arkansas Inspection & Rating Bureau, appellant, (to which we shall refer as Bureau) is a private rating organization functioning under § 66-406 of the above rating law, its primary purpose being to file fire insurance rates, rating plans, schedules, and rules with the Insurance Commissioner for approval under said rating law, on behalf of the member insurance subscribers of the Bureau.

Appellee, Insurance Company of North America (to which we shall refer as North America) is the oldest, and one of the largest, stock fire insurance companies in the United States.

The present appeal of the Bureau challenges that part of the judgment of the Pulaski Circuit Court which upheld the Insurance Commissioner's order permitting North America to use and attach to its fire insurance policies written for term of three or five years, the Installment Premium Endorsement.

North America has cross-appealed from that part of the judgment of the Circuit Court which reversed so much of the Insurance Commissioner's order as held that North America's filing under the rating law was not a deviation, but a direct filing.

The order of the Insurance Commissioner, to which reference is made above, recited:

"1. The Rating Bureau, which is the rating organization duly qualified under the Arkansas Fire Insurance Rating Law, has filed with the Commissioner a rating rule, known as the 'term rule,' which permits fire insurance companies to write policies on prescribed classes

of risks at the premium produced by two and one-half times the annual rate for terms of three years, and by four times the annual rate for terms of five years.

"2. The Installment Premium Endorsement of the North America Companies is an endorsement which may be attached to fire insurance policies written under the aforesaid term rule. For the attachment of the endorsement, the policyholder is required to pay the insurer, in addition to the full term premium, an extra charge to compensate the company for the cost to it of deferring collection of the premium, and for providing that the insurance coverage of the policy shall not be reduced by the payment of a loss.

"3. The Rating Bureau does not have on file with the Commissioner, under the provisions of the Arkansas Fire Insurance Rating Law, any rate, rating schedule, rating plan, rule, or regulation with which the use of the Installment Premium Endorsement is inconsistent or from which the Installment Premium Endorsement is a deviation. Installment Payment of Premium is a change of custom only, not statute. In fact, there is no filing of the Rating Bureau which requires premiums on fire insurance policies to be paid in full at the inception of the policy, and there is no filing of the Rating Bureau which provides that insurance coverage provided by fire insurance policies shall not be reduced by the payment of losses.

"4. The use of the Installment Premium Endorsements in Arkansas by North America and other companies provides persons, whose risks qualify for fire insurance under the term rule, with a method of taking advantage of the term rule discounts, without being required to pay the term premium in full at the inception of the policy. The need for such a facility is demonstrated by the fact that there are financial institutions in Arkansas engaged in lending insureds money on notes, the security being the unearned premium value of term fire insurance policies, for the purpose of permitting such insureds to take advantage of the said term discounts.

"5. There is no requirement of Arkansas law which prevents the use of the Installment Premium Endorsement. The Rating Bureau has a rule on file with the Department which permits term fire insurance policies to be written on a budget plan, and also a rule which permits term fire insurance policies to be written on farm property on an installment plan. Installment plans are customary in virtually every type of insurance other than Fire, such as Life, Inland Marine and Casualty. Morever, it is permissible in Arkansas for the insurer to accept from the policyholder a promissory note in lieu of cash in payment of the premiums on fire insurance policies.

"6. Installment Premium Payment Plan is not limited to North America Companies. In fact, as of this date, *36* fire insurance companies have sought and received permission to use the endorsement in Arkansas, which fact is a matter of public record as reflected by the records in the office of the Insurance Commissioner, which records are kept as required by law and of such records, Courts will take judicial knowledge. *Riggs* v. *Brock,* 208 Ark. 1050, 189 S. W. 2d 367; *State* v. *Guthrie,* 203 Ark. 60, 156 S. W. 2d 210, and *State, ex rel. Atty. General* v. *State Board of Education,* 195 Ark. 222, 112 S. W. 2d 18. Since the endorsement may be used by all fire insurance companies, upon request to and approval by the Commissioner, there has been no monopolistic practices by any of the companies. By making available term fire insurance on the installment basis, the endorsement makes it possible for a larger portion of the insuring public to purchase more adequate fire insurance, which is desirable and in the public interest.

"7. The evidence presented at the hearing does not show that the rates produced by the filing of the North America Companies are excessive or inadequate. The endorsement has not yet been sufficiently used in Arkansas to determine by statistics whether the rates charged are too high or too low. The filing was based, on the judgment of the insurer, in conformity with the Arkansas Fire Insurance Rating Law, Ark. Stats., §

66-404. Likewise, justification for the prepaid term rule is based on the judgment of the insurer, since no statistics are on file with the Commissioner supporting said rule. It may be presumed from the fact that the endorsement continues to be offered for sale, and purchased by policyholders in this and 34 other states, that the rates are neither inadequate nor excessive. The Commissioner may exercise his statutory authority at any appropriate time to examine the records of the insurers using the endorsement to determine whether the charges are proper after sufficient experience has been acquired.

"8. The Installment Premium Endorsement Plan is not unfairly discriminatory; provided, the endorsement is made available to any and all prospective purchasers whose risk would be acceptable and qualifies for prepaid term insurance under the term rule.

"9. The Installment Premium Endorsement is an enforcible obligation, and it is therefore not necessary to require the policyholder to give the insurer a negotiable instrument for the payment of the premiums and installments. See 44 C. J. S., §§ 353, 355 (a), 355 (b), and 358 (e).

"10. The ruling of my predecessor in office, Honorable JACK G. McKENZIE, that unearned premium reserves need not be set up as installments are paid, is affirmed.

"11. The Commissioner finds that had the Legislature intended that he be given authority to regulate or prohibit installment premium payments, it would have so stated in clear and unambiguous language. The General Assembly of the State of Arkansas, by Ark. Stats., § 66-401, *et seq.,* regulated the premium rates for fire, marine and inland marine insurance and authorized the establishment and operation of rating organizations; and in so doing did not give to the Commissioner authority or power to prohibit or control installment payment of premiums. The silence of the Legislature on installment payments of premiums impliedly inhibits the Commissioner from thus regulating or prohibiting said installment payment of premiums. *Cook, Commissioner of*

*Revenues* v. *Arkansas-Missouri Power Corporation*, 209 Ark. 750, 192 S. W. 2d 210.

"12. The Commissioner finds that the Installment Premium Plan enables the Fire Insurance industry to serve its policyholders in the same way that many other businesses have been doing for years. The Installment Premium Plan reduces the occasion for resorting to outside agencies to perform functions which the Fire Insurance industry itself is capable of doing. Indeed, it is the Commissioner's findings that the insuring public is better served by the Installment Premium Plan, which plan is less complex and less expensive than facilities offered by other agencies. Furthermore, in the absence of statutory authority, the Commissioner, as a practical matter, is of the opinion that he had no authority to adopt any policy which tends to deprive insurers of the right to finance directly the payment of premiums on policies which they write. Any other position by the Commissioner would, as reflected by the record, lead to the use of other agencies, which would accomplish the same result by indirection as does the Installment Premium Plan, and, in the process would increase the cost to the policyholder."

The Commissioner, having reviewed the evidence, concluded as follows:

"I. (a) The Installment Premium Endorsement as filed with the Commissioner by the North America Companies is a filing within the meaning of the Arkansas Fire Insurance Rating Law, Ark. Stats., § 66-404, and is not a deviation, but merely variation from a custom of the prepaid term rule.

"(b) The said filing complies in all respects with the Arkansas Fire Insurance Rating Law, Ark. Stats., § 66-403.

"(c) The said filing is justified and the Installment Premium Endorsement of the North America Companies may be continued in use in Arkansas according to the terms and conditions of said filing, provided, all

prospective purchasers whose risks would be acceptable by the insurer on the prepaid term plan, must, at the option of the purchaser, be permitted to purchase said insurance on Installment Premium Payment Plan.

"II. Determination of whether said Installment Premium Endorsement is a deviation under Ark. Stats., § 66-407, is, in final analysis, a legal question. If the Court holds said plan to be a deviation, then, in that event, it is the Commissioner's finding that said rates as set forth in the endorsement are not excessive, inadequate or unfairly discriminatory."

The Circuit Court found:

"1. That part of the order which holds the Installment Premium Endorsement not to be a deviation under Ark. Stats., 1947, § 66-407, is in error and should be reversed for the reason that the use of the endorsement is a variation from the long established practice or custom in the fire insurance business of requiring premiums for term fire insurance policies to be paid at the inception of the policy, and also because the Installment Premium Endorsement, in providing that the amount of insurance afforded by the policy to which it is attached shall not be reduced by the payment of a loss, is a variation from the long established custom or practice in the fire insurance business of reducing the amount of fire insurance policies by the amount of losses paid during the term of such policies.

"2. That all other portions of the order are correct and should be affirmed."

A question of law is presented.

The facts appear not to be in dispute and we think support the Commissioner's findings.

Act 50 of 1947, above, provides in part:

"Section 1. *Purpose of Act.* The purpose of this Act is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to authorize

and regulate cooperative action among insurers in rate making and in other matters within the scope of this Act. Nothing in this Act is intended (1) to prohibit or discourage reasonable competition or (2) to prohibit or encourage, except to the extent necessary to accomplish the aforementioned purpose, uniformity in insurance rates, rating systems, rating plans or practices. This Act shall be liberally interpreted to carry into effect the provisions of this section. . . .

"Section 3. . . . (a) 2. Rates shall not be excessive, inadequate or unfairly discriminatory. . . . (b) No insurer, nor any rating bureau, shall fix or charge any rate which discriminates unfairly between risks in the application of like charges and credits, or which discriminates unfairly between risks of essentially the same hazard, territorial classification, and having substantially the same degree of protection. (c) Except to the extent necessary to meet the provisions of subdivision 2 of subsection (a) of this section, uniformity among insurers in any matters within the scope of this section is neither required nor prohibited. . . .

"Section 4. . . . (a) Every insurer shall file with the Commissioner, . . . every manual, minimum, class rate, rating schedule or rating plan and every other rating rule, and every modification of any of the foregoing which it proposes to use. . . .

"Section 7. *Deviations.* Every member of or subscriber to a rating organization shall adhere to the filings made on its behalf by such organization except that any such insurer may make written application to the Commissioner for permission to file a deviation from the class rates, schedules, rating plans or rules respecting any kind of insurance, or class of risk within a kind of insurance, or combination thereof. . . . In considering the application for permission to file such deviation the Commissioner shall give consideration to the available statistics and the principles for rate making as provided in § 3 of this Act. The Commissioner shall issue an order permitting the deviation for such insurer to be filed if he

finds it to be justified and it shall thereupon become effective. He shall issue an order denying such application if he finds that the resulting premiums would be excessive, inadequate or unfairly discriminatory. . . ."

The Installment Premium Endorsement Plan permits the insured, after paying 25% of the total premium in advance, to pay the remainder of the premium, on three or five-year term insurance policies to which the Installment Endorsement is attached, in annual installments instead of in full when the policy is procured. It also provides that the coverage offered shall not be reduced by payment of a loss, which provision is, in effect, an automatic reinstatement. On this Installment Endorsement Plan, open to all policyholders, the insured pays the insurance company the full term premium and an extra charge of 3% on the deferred installments, as cost to the company for carrying and deferring the payment of premium collections and providing automatic reinstatement in case of loss.

There is on file with the Bureau a rating "term rule" used by all fire insurance companies, which permits fire insurance policies written for a term of three years to be sold for two and one-half times the annual premium, and for a five-year term, at four times the annual premium. Under this "term rule" insured is required to pay the entire premium in cash. In order to take advantage of the above "term rule" many policyholders who are unable to pay the full term premium in cash in advance, take advantage of the discount or savings offered, by borrowing the necessary money from financial institutions and repaying these loans in installments with interest thereon, which, in effect, made this method more expensive than the Installment Endorsement Plan by North America.

The first purpose of Act 50 was to promote the public welfare to whatever extent that might be done through regulation of insurance rates within the phases dealt with. They must not be excessive, inadequate, or unfairly discriminatory, hence cooperative rate-making was authorized under a formula not intended to *discourage*

reasonable competition; secondly, there was no thought of prohibiting or *encouraging* (a) uniformity in the rates, (b) uniformity in the rating systems, and, (c) uniformity in rating plans and practices—except to the extent that the three uniformities were necessary to accomplish expressed purposes of the Act.

It is noteworthy that the lawmakers used the word "discourage" in negativing an intent to prohibit reasonable competition, while "encourage" was employed to disaffirm matters mentioned in (a), (b), and (c). Section 1 of Act 50 is part of a uniform law presumptively prepared by insurance companies, and has been adopted in other states as a sequence to the decision in *United States v. South-Eastern Underwriters Association*, 322 U. S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440, decided in 1944. It was there held that an insurance company doing a substantial part of its business "among the several states" was engaged in interstate commerce within the meaning of the Sherman Anti-Trust Act. An illustration of the uniformity with which the insurance companies sought to meet the issue is to be found in a comparison of § 1 of Act 50 with other state legislation. See Laws of Maryland, 1949, ch. 510, pp. 1232-3. The word "encourage" appears in the Maryland statute.

Here, all fire insurance companies charge the same basic rate on each one hundred dollars of coverage, and all, including North America, may sell Term Insurance, but North America proposes to sell also under the Installment Term Endorsement Plan.

The Insurance Commissioner found that North America was entitled to sell under the Installment Term Endorsement Plan, as filed with the Commissioner.

Before the Rating Bureau was created its predecessor dealing with related matters was Arkansas Fire Prevention Bureau. The plan of deferred premium payments and other variations now thought by the Bureau to be deviations had been proposed by North America through endorsement forms similar to those now being used. This occurred in 1946, supplemented by supporting data ten days later. Act 50 became effective July 1, 1947,

but by subdivision (i) of § 4 "All filings of rates which insurers propose to make effective on January 1, 1948, (must be in the hands of the Commissioner) not later than October 1, 1947, and all such rates not disapproved by the Commissioner prior to December 1, 1947, shall be considered approved."

The Commissioner called North America's attention to Act 50 October 17, 1947. However, three days earlier North America had resubmitted the existing plan. It was reapproved in succeeding years.

North America takes the position that the law itself gives effect to the rates because the identical method of writing insurance now objected to by the Bureau was on file prior to December 1, 1947, and it was not disapproved.

Appellant insists that when the Commissioner notified North America that it should refile, and North America acquiesced, the parties thereby construed the requisite procedure, hence they cannot now be heard to plead otherwise. It is also insisted that the courts are bound by such inter-party construction, citing *Yarrington* v. *John Hancock Mutual Life Insurance Company*, 211 Ark. 474, 201 S. W. 2d 763. But in the Yarrington case a contract (as distinguished from a statute) was involved. Courts are not required to adopt the construction interested persons have placed on a legislative act, although where the language is doubtful and a subdivision of the State is involved, high regard will be accorded a construction accepted over a substantial period of time.

In the instant case we find nothing in North America's plan that involves a violation of the law, and it is difficult to rationalize appellant's contentions that the rate filing placed with the Commissioner and not disapproved prior to December 1, 1947, did not automatically become effective.

Accordingly, the judgment is affirmed on direct appeal and on cross-appeal reversed and remanded, with

directions to enter a judgment consistent with this opinion.

GEORGE ROSE SMITH, J., dissenting. If I correctly understand the majority opinion the court holds that the installment premium indorsement is not a deviation for the reason that it was not disapproved prior to December 1, 1947. I do not see why this fact makes any difference. The Act provides that all filings shall become effective after fifteen days unless disapproved by the Commissioner within that period. Ark. Stats. 1947, § 66-404 (d). Evidently the legislature wanted to provide a waiting period before the Act went into effect, so that insurance could still be sold at existing rates until new rates could be filed under the Act. All that § 66-404 (i) does is to designate the period between October 1 and December 1, 1947, as the time for filing the initial rates under the new law. If the installment premium indorsement was then a deviation, and I think it too plain for argument that it was, the fact that it happened to be one of the initial filings is immaterial. I agree that the plan is not unfairly discriminatory, but I do think it a deviation and so would affirm the judgment on cross appeal.